UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| R. PATRICK SHARP, III AS DISTRIBUTION TRUSTEE FOR THE DISTRIBUTION TRUST OF EVANS INDUSTRIES, INC. | CIVIL ACTION |
| VERSUS | NO: 09-3548<br>BANKRUPTCY CASE<br>NO. 06-10370<br>ADVERSARY<br>PROCEEDING NO. 08-1050 |
| GREIF INDUSTRIAL PACKAGING & SERVICES, LLC | SECTION: "S" (5) |

**OPINION**

Greif Industrial Packaging & Services, LLC appeals the bankruptcy court's denial of its claims for environmental cleanup and for payments made to Ingersoll-Rand. The Trustee of the Distribution Trust of Evans Industries, Inc. appeals the bankruptcy court's denial of a claim for the prorated premium paid by Evans Industries, Inc. to Lexington Insurance Company. For the reasons set forth, the decision of the bankruptcy court denying Greif Industrial Packaging & Services, LLC's holdback for environmental claims and for payments made by Greif Industrial Packaging & Services, LLC to Ingersoll-Rand is **AFFIRMED,** and the decision of the bankruptcy court denying the Trustee of the Distribution Trust of Evans Industries, Inc.'s setoff claim against Greif Industrial

Packaging & Services, LLC for prepaid insurance premiums is **REVERSED**. The matter is **REMANDED** to the bankruptcy court for further proceedings consistent with this opinion.

**BACKGROUND**

Evans Industries, Inc. ("Evans") was in the business of manufacturing steel drums, filling industrial containers with products, and warehousing and distributing the filled containers. On April 25, 2006, Evans filed for Chapter 11 protection in the United States Bankruptcy Court for the Eastern District of Louisiana. On October 24, 2006, the bankruptcy court confirmed "Evans Amended Plan of Reorganization" (the "Plan"). A Distribution Trust of Evans Industries, Inc. (the "Trust") was formed, and the proceeds of the sale of most of Evans' assets would become an asset of the Trust to be distributed in accordance with the Plan. R. Patrick Sharp, III was appointed Distribution Trustee (the "Trustee") for the Trust.

On November 6, 2006 (the closing date), Greif Industrial Packaging & Services, LLC ("Greif") entered into an Asset Purchase Agreement (the "Agreement") with Evans. Pursuant to the Agreement, and as contemplated by the Plan, certain ongoing business operations of Evans at five premises were sold for $11,250,000. Greif was allowed a holdback of $1,657,500, to be paid into an escrow account, as security for Evans' obligations under the Agreement.[1] If Greif made a claim

---

[1] Under the Agreement, Greif was required to pay to Evans:

> an amount equal to $1,657,500 . . . to an interest bearing escrow account for period not to exceed twelve (12) months subject to distributions described below, as security for [Debtor's] obligations hereunder (the Holdback). Every four months from [November 6, 2006], if no Holdback Claims have been made, $414,375 plus any accrued interest shall be transferred by wire to the single account designated by the Official Unsecured Creditors Committee.

2

against the holdback, and Greif and the Trustee were unable to agree on the matter, the dispute would be submitted to the bankruptcy court for determination.

Greif makes two claims against the holdback: (1) $649,633.75 that Greif expended to clean up hazardous waste at four business premises,[2] and (2) $10,452.06 paid by Greif for five Bobcat loaders that were subject to a Security Agreement by Evans in favor of Ingersoll-Rand.[3]

The Trustee resisted these claims and filed a complaint with the bankruptcy court in an adversary proceeding seeking to compel Greif to release withheld funds from the holdback. The complaint also alleges the Trustee's claim for the prorated premium paid by Evans for an insurance policy acquired by Greif as a setoff against any valid holdback claims.[4]

---

[2] The properties are located at 1255 Peters Road, Harvey, Louisiana; 2800 Peters Road, Harvey, Louisiana; 3950 Highway 30, St. Gabriel, Louisiana; and 10521 Sheldon Road, Houston, Texas.

[3] Greif did not pay the first or second quarter holdbacks of $414,375 or assert a timely off set against either quarter. As of August 28, 2007, Greif had placed the firth tree holdback payments in the escrow account, but did not remit any payments to Evans. On August 28, 2007, Evans sent a demand letter to Greif for payment of any undisputed holdback amounts and requested an explanation and documentation for any holdback claims. In response, Greif asserted holdback claims for: $174,011.12 for payroll for the week ending November 11, 2006; $10,452.06 for payments made by Greif to Ingersoll Rand on June 26, 2007; funds expended on the removal of hazardous waste and chemicals which was estimated at $364,701.00 as of October 1, 2007; and, $37,477.53 for property taxes prorated from the closing date. Thereafter, Greif submitted invoices for environmental cleanup costs of $374,567.98 for the four properties on October 3, 2007, after the deadline for submission of holdback claims for the first, second, and third quarters. Cleanup costs of $80,000 were incurred in the fourth quarter. On April 24, 2008, the Evans filed an adversary complaint to compel Greif to pay the holdback. Greif paid Evans $775,750.07, which represents the undisputed amount in excess of the holdback claims that was due to the Distribution Trust. Further, Evans acquiesced in Greif's holdback claims for payroll and property taxes, which totaled $211,488.65. Thus, the disputed amounts that Greif retained as holdback consisted of $649,633.75 for the environmental cleanup claims and $10,452.06 for the Ingersoll Rand payment.

[4] The Trustee also pursued a claim against Greif for $5,238.09 for utility deposits posted by Evans but refunded to Greif. The bankruptcy court ordered that Greif pay Evans $5,238.09, for the utility deposit posted by Evans but refunded to Greif when the bankruptcy court found that Greif was not entitled to retain a holdback. Neither party appealed that portion of the bankruptcy court's opinion.

The bankruptcy court denied Greif's environmental claims and the claim for payments made to Ingersoll-Rand. The bankruptcy judge also denied the Trustee's setoff claim for the prorated insurance premium. Pursuant to 11 U.S.C. § 158(a), Greif appeals from the order of the bankruptcy court on March 26, 2009 (Doc. #37) and judgment on March 26, 2009 (Doc. #38), and the Trustee filed a cross-appeal.

**DISCUSSION**

**A. Standard of review**

District courts of the United States have jurisdiction to hear appeals from orders of the bankruptcy court. See 28 U.S.C. § 158(a). "[C]onclusions of law are reviewed *de novo*, findings of fact are reviewed for clear error, and mixed questions of fact and law are reviewed *de novo*." In re Nat'l Gypsum Co., 208 F.3d 498, 504 (5th Cir. 2000).

**B. Environmental claims ($649,633.75)**

Greif filed a claim for the environmental clean-up of hazardous waste contained in hundreds of drums left behind at four of former Evans' premises.[5] Greif spent $372,187.98 for removal and disposal of the drums on the four properties. At the 1255 Peters Road facility, Evans left behind six horizontal storage tanks containing 13,000 gallons of paint sludge, a hazardous waste. Greif expended $277,445.77 to dispose of the tanks and their contents.

---

[5] All of the properties were leased; but Evans assumed and assigned the lease to Greif for only the St. Gabriel property. This transaction was a separate transaction that was not within the terms of the Agreement. After the closing date, Greif independently negotiated and entered into leases for 1255 Peters Road, 2800 Peters Road, and 10521 Sheldon Road.

In the adversary proceeding, Greif argued that it is entitled to an offset against its obligation to the Distribution Trust because the environmental damage at the former facilities breached two warranties under the Agreement. Specifically, Evans warranted the condition of the acquired assets and warranted that it was in compliance with environmental law.

The bankruptcy court held that Greif did not have a holdback claim against Evans "because, under the [Agreement], Greif specifically released Evans from any responsibility for environmental liabilities associated with either the condition of the Acquired Assets, Evans ownership or operation of its business, or the real property leases." The bankruptcy court further stated:

> Although under the [Agreement] Evans clearly retained all environmental liabilities associated with the 1255 Peters and Houston properties, as well as the Acquired Assets, the [Agreement] contains no requirement that Evans satisfy the retained obligations. In fact, the [Agreement] specifically acknowledges that Evans has no responsibility, nor does Greif have recourse against Evans, for retained environmental liabilities. Greif has failed to articulate any provision of the [Agreement] to refute this interpretation.
> The retained liabilities are for environmental claims caused by Evans' conduct *prior* to the closing date. Because the leases associated with these properties were rejected at confirmation, any claims due the landlords were claims arising in the bankruptcy case. The payment of claims against the Evans' bankruptcy estate are governed by the Plan. Nothing in the Plan calls for peculiar or special treatment of these claims. Instead, the Plan's provisions regarding the satisfaction of unsecured and administrative claims controls.
> Under the terms of the Plan, holders of lease rejection claims had forty-five days after confirmation to file a request for payment. Both landlords received notice of the Plan and its terms prior to confirmation, and both were noticed of the bar date. Neither landlord filed a claim for environmental damages under the leases although both filed claims for other damages. As a result, any pre-petition claim they might possess for environmental damage is now time barred.
> Similarly, neither landlord filed a request for recognition of an administrative claim. . . . Since none of the landlords asserted any administrative request based on environmental damage, any potential claims are now time barred.
> The consequence of the landlords' failure to assert any claim against Evans for environmental damage is that, if any do exist, they are now barred by the discharge

5

injunction granted at confirmation. Greif, as a potential assignee or subrogee of the landlords, is also barred from asserting these claims.

The bankruptcy court further concluded that Greif failed to prove that any environmental violations existed on the property or that the costs of cleanup were a result of governmental order or action requiring cleanup of the properties. The court stated that the parties to the Agreement are sophisticated, and both were aware that hazardous materials were a part of Evans' normal business operations. Nonetheless, the parties provided in their contract that Evans would have no responsibility to Greif, and Greif would have no recourse against Evans for the retained environmental liabilities.

Greif argues that the reasoning is contrary to the Agreement because Evans retained liabilities arising from the operation or conduct of Evans' business. Greif contends that, under the Agreement, Evans has the obligation to clean up the hazardous waste that resulted from Evans' operation of the business. Greif argues that discharge of an obligation owed to the lessors does not equate to discharge of an obligation owed to Greif.

The bankruptcy court did not err in concluding that Evans has no responsibility, nor does Greif have recourse against Evans, for retained environmental liabilities caused by Evans' conduct prior to the closing. The existence of hazardous materials on the properties was acknowledged by Greif in the Agreement.[6] Evans agreed to "retain any and all liabilities and obligations . . . arising

---

[6] Section 5.11.4 of the Agreement provides:

> Due to the nature of Seller's business, [Greif] acknowledges there are hazardous materials, including but not limited to those listed on Exhibit Z hereto present on or in the environment at any properties owned, leased, or occupied by Sellers including any hazardous materials contained in barrels,

6

out of or calculated with reference to the ownership, use or possession or the transfer of the Acquired Assets, or the operation or conduct of the Business, prior to or on the Closing Date." Asset Purchase Agreement at § 2.3. The liabilities excluded from the Agreement include environmental liabilities as follows:

> 2.3.12 All environmental liabilities resulting from or arising out of the ownership or operation of the Business, obligations under the Real Property Leases, the condition of the Acquired Assets or an environmental claims that a release occurred, in each case on or prior to the Closing Date.

The leases were rejected in the Plan, and any claims by the landlords arose in the bankruptcy case. The landlords received notice of the Plan prior to its confirmation, but did not file a claim for environmental damage under the lease within the time provided in the Plan. Therefore, any claim by the landlord or Greif as the assignee or subrogee of the landlords is time-barred. Further, under the Agreement, Greif did not have the right to make a claim against Evans for the environmental cleanup. The decision of the bankruptcy court denying Greif's environmental claims against the holdback is affirmed.

**C. Reimbursement for payment to Ingersoll-Rand ($10,452)**

In September 2004, Evans purchased five Bobcat Skid-Steer loaders. Ingersoll-Rand Financial Services financed the purchase and obtained a security interest in the loaders. Greif acquired the five loaders through the Agreement. However, the parties stipulated that Greif did not

---

above ground or underground storage tanks, landfills, dumps, equipment or other containers, either temporary or permanent, or otherwise incorporated into any structure therein or thereon. . . .

assume the debt to Ingersoll-Rand. Evans' secured debt to Ingersoll-Rand was omitted from the Plan; and Ingersoll-Rand looked to Greif, which made installment payments totaling $10,452.06.

Greif contends that the Plan failed to provide for payment of Evans' debt to Ingersoll-Rand, and because neither Evans nor the trustee paid the debt, it fell to Greif to pay $10,452.06. Greif argues that it is entitled to recover from the holdback the sums paid to Ingersoll-Rand because the value of the five loaders was included in the original purchase price.

The parties stipulated before the bankruptcy court that Evans' contract and liability with Ingersoll-Rand was not an asset or liability which was transferred to Greif by Evans, and the debt was not an assumed liability under the Agreement. The bankruptcy judge concluded that "the payments made by Greif to Ingersoll-Rand do not fall within [Agreement's] definition of 'Holdback Claim' as these payments would not entitle Greif 'to claim a material breach by [Evans] of a covenant or obligation under [the APA] or of [Evans] representations and warranties.'" The bankruptcy court reasoned that the order confirming the Plan provided that all acquired assets were to be transferred free and clear of all liens and encumbrances. No motion was filed to amend the Plan to recognize Ingersoll-Rand's claim, and no evidence has been provided to establish that a debt is owed by Evans to Ingersoll-Rand. Accordingly, there is no error in the bankruptcy court's findings of fact and conclusions of law that Greif may not offset against the Holdback the amounts paid to Ingersoll-Rand, and the decision of the bankruptcy court is affirmed.

**D. Trustee's cross appeal on setoff claim for prepaid insurance premiums as of closing date ($97,225.12)**

The claim for the premium is based on the following facts. Evans was the named insured on an all risk policy issued by Lexington Insurance Company. As of the closing date, Evans had paid $223,294.34 of the total premium, and $22,934.60 remained to be paid, but was not yet due. Evans agreed to allow Greif to be substituted as the named insured, subject to Greif's payment to Evans of the pro-rata amount remaining on the premium that had already been paid and Greif's payment to Lexington Insurance Company of the $22,934.60 still owed. Greif agreed to the terms. As of November 5, 2006, the unused premium paid by Evans to Lexington, with coverage until May 3, 2007, was $97,225.12.

The Trustee contends that the Lexington policy was not an asset which was included in the Agreement and that insurance deposits were specifically excluded from the assets transferred by Evans to Greif under the Agreement. The Trustee contends that Greif's purchase of the Lexington policy was separate and apart from the purchase price and sale in the Agreement. Greif replaced Evans as the named insured on the policy as of the closing date and agreed to pay Evans for the unearned pre-paid premiums. The Trustee contends that, as of November 6, 2006, Evans had nothing to insure under the Lexington policy, and the total unused premium was $120,159.72. Because $22,934.60 had not yet been paid, the unearned premium at closing is $97,225.12. The Trustee seeks to collect the unearned premium at closing as a setoff from payment of any holdback allowed to Greif.

9

The bankruptcy court denied the Trustee's demand for the return of the unearned premium as a setoff against the disputed portion of the holdback. The bankruptcy court concluded that the Lexington policy was rejected under the Plan and, as of the confirmation date, the policy was not an asset of Evans subject to transfer under the Agreement or the confirmation order. The bankruptcy court further concluded the unearned premium is owed to Evans, but not by Greif. Specifically, the bankruptcy court stated the Lexington policy was a contract between Lexington and Evans; thus, Lexington, not Greif, is the party with the obligation to Evans.

The court concludes that the bankruptcy court erred in denying the Trustee's claim. The bankruptcy court correctly concluded that the Lexington Policy was not an asset acquired by Greif under the Agreement. However, the bankruptcy court erred in finding that, as of the confirmation date, the Lexington policy was not as asset of Evans that Evans could sell. The parties stipulated that the Lexington policy was a post-petition contract. Evans filed for Chapter 11 protection on April 25, 2006. The Lexington policy was not effective until May 3, 2006. Therefore, Evans' rights under the Lexington policy were not affected by the confirmation of the Plan, and it remained an asset of Evans after the confirmation.

Further, the weight of the evidence presented shows that the transfer of Evans' rights under the Lexington policy to Greif was outside and apart from the Agreement. Section 1 of the Agreement lists the assets that were purchased by Greif. The list includes: leases and contracts; real property and improvements; tangible personal property; intellectual and intellectual property; books and records; receivables; and, inventory. Additionally, the specific items included in these broad categories are described in exhibits to the Agreement. The Lexington policy is not mentioned. The

10

court notes that the list of acquired assets includes "other assets," which are defined as "[a]ll other assets of [Evans] used in the conduct of the Business, whether or not reflected on the books or records of [Evans] or the Business, other than the Excluded Assets." Greif argues that the aforementioned catchall includes the Lexington policy. However, inclusion of such an important asset, worth $97,225.12 in unused premiums to Evans, in a catchall is inconsistent with the remainder of the Agreement that specifically identifies the both major and minor acquired assets.

Also, the Agreement provides that "prepaid insurance deposits" are excluded from the acquired assets. This term can be construed to include prepaid insurance premiums, especially in light of the fact that if Evans had chosen to cancel the Lexington policy instead of permitting Greif to be substituted as the named insured, Lexington would have returned the prepaid unused premium to Evans. Moreover, Evans and Greif negotiated the transfer of the Lexington policy outside of the Agreement and did not agree on consideration until after the Agreement closing.

Therefore, Greif owes Evans the unearned premium from which it benefitted but did not purchase as part of the Agreement. Accordingly, the decision of the bankruptcy court is reversed. Because this court finds that Greif is not entitled to the $649,633.75 holdback for environmental claims, nor the $10,452.06 holdback for payments Grief made to Ingersoll-Rand, there is no holdback amount against which to setoff the Lexington policy premiums. Therefore, Greif shall pay $97,225.12 to Evans.[7]

---

[7] The court notes that ordering Greif to pay $97,225.12, to Evans for the Lexington premium is consistent with the bankruptcy court's order that Greif pay Evans $5,238.09, for the utility deposit posted by Evans but refunded to Greif when the bankruptcy court found that Greif was not entitled to retain a holdback. Further the court notes that neither party appealed that portion of the bankruptcy court's opinion.

## III. CONCLUSION

The opinion of the bankruptcy court denying holdback for environmental claims and for payments made by Greif to Ingersoll-Rand is affirmed. Further, the opinion of the bankruptcy court denying the Trustee's setoff claim against Greif for prepaid insurance premiums is reversed, and Greif shall pay $97,225.12 to Evans. The matter is remanded to the bankruptcy court for further proceedings consistent with this opinion.

New Orleans, Louisiana, this __23rd__ day of March, 2010.

_____
**MARY ANN VIAL LEMMON
UNITED STATES DISTRICT JUDGE**